IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MAGDONALD ADAMS-ERAZO, *et al.*, <br><br> **Plaintiffs**, <br><br>           v. <br><br> HOSPITAL SAN GERARDO, *et al.*, <br><br> **Defendants**. | **Civil No.** 13-1918 (FAB) |

OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Hospital San Gerardo's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (Docket No. 17.)  For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** the motion to dismiss.

I.   BACKGROUND

   A.   Factual Background as Alleged in the Complaint

      As required by Rule 12(b)(6)'s analytical framework, the Court treats as true the following non-conclusory factual allegations stated in the plaintiffs' complaint, see Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

      Eric Adams-Ramos ("Adams") arrived at the Hospital San Gerardo ("HSG") emergency room at 9:40 p.m. on December 17, 2012, after sustaining several gunshot wounds.  (Docket No. 1 at ¶¶ 12-13.)  HSG personnel completed triage on Adams at 9:55 p.m. Id. at ¶ 13.  At 10:04 p.m., the emergency room at the Puerto Rico Medical Center accepted the transfer of Adams to its facilities, but an

Civil No. 13-1918 (FAB)                                                    2

ambulance was never dispatched and Adams remained in the HSG emergency room.  Id. at ¶¶ 17-18.  Adams was not treated to avoid hemorrhagic shock, was not administered blood to replace the deficit caused by his bleeding, and was not given intravenous liquids to treat his hypotension.  Id. at ¶ 14.  Defendant HSG did not provide the "the surgical and radiological consultations and treatments that [Adams's] condition required," did not "try[] to identify the source of the bleeding and hypotension," did not perform a thoracotomy or a needle decompression of Adams's chest, and did not insert bilateral chest tubes.  Id. at ¶¶ 21, 25.  Defendant HSG did not follow its protocols for patients with gunshot wounds or its Advance Trauma Life Support program.  Id. at ¶ 26.  Adams suffered a cardiac/respiratory arrest at 10:50 p.m. and was declared dead at 11:10 p.m., ninety minutes after arriving at HSG.  Id. at ¶ 20.

**B.   Procedural Background**

Plaintiffs, who are surviving family members of Adams, filed suit against HSG and other defendants pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141-42, for the defendants' alleged failure to screen, diagnose, stabilize, treat, and transfer Adams adequately, causing or contributing to his death.  (Docket No. 1.)  Defendant HSG moved the Court to dismiss plaintiffs'

Civil No. 13-1918 (FAB)                                                          3

claims pursuant to Rule 12(b)(6), arguing that the facts alleged in the complaint do not state an EMTALA claim upon which relief can be granted, and that the Court should decline to exercise supplemental jurisdiction over the Puerto Rico law claims. (Docket No. 17.) Plaintiffs opposed the motion, (Docket No. 33), and submitted exhibits in support of their opposition, (Docket No. 39). HSG replied to the opposition. (Docket No. 44.)

## II.   LEGAL STANDARD FOR A RULE 12(b)(6) MOTION TO DISMISS

Rule 12(b)(6) allows the Court to dismiss a complaint when the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In resolving a motion to dismiss, the Court employs a two-step approach. First, the Court "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Second, the Court "take[s] the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see[s] if they plausibly narrate a claim for relief." Id. "The relevant question for a district court in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.'" Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 55 (1st Cir.

Civil No. 13-1918 (FAB)                                                  4

2013) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 569 n.14 (2007)).  The complaint need not include a "high degree of factual specificity," but "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."   Rodriguez-Reyes, 711 F.3d at 53, 56 (internal citations and quotation marks omitted).

**III. PLAINTIFFS' EMTALA CLAIMS**

Congress enacted EMTALA in response to concerns "about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (quoting H.R. Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605).  Congress, however, "did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care," rather, "the minimal screening and stabilization requirements were designed solely to prevent the specific injury of patient 'dumping,' which state malpractice law often could not redress."  Fraticelli-Torres v. Hosp. Hermanos Melendez, 300 F. App'x 1, 3-4 (1st Cir. 2008).

Pursuant to the standard outlined by the First Circuit Court of Appeals, to establish an EMTALA violation, a plaintiff must show that: "(1) the hospital is a participating hospital, covered by

Civil No. 13-1918 (FAB)                                                        5

EMTALA, that operates an emergency department; (2) the [patient] arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if [he or] she had an emergency medical condition, or (b) released the patient without first stabilizing the emergency medical condition." Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 63, 68 (1st Cir. 2013).  The parties do not contest that HSG is a participating EMTALA facility and that Adams arrived at the HSG emergency room seeking medical treatment.  At issue is whether plaintiffs plausibly narrate claims for relief pursuant to EMTALA's screening and stabilization provisions.

    **A.**    **EMTALA Screening Claim**

When a patient arrives at a hospital seeking treatment, EMTALA's screening provision requires that the hospital "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists."  42 U.S.C. § 1395dd(a).  EMTALA does not define what an "appropriate medical screening examination" consists of, but the First Circuit Court of Appeals has held that a hospital meets its EMTALA screening duty if it (1) provides "an examination 'reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients,'" and (2) "'provides that

Civil No. 13-1918 (FAB)                                                6
_____

level of screening uniformly to all those who present substantially similar complaints.'"  <u>Cruz-Vazquez</u>, 717 F.3d at 69 (quoting <u>Correa</u>, 69 F.3d at 1192).

"Whether a hospital's existing screening protocol was followed in a circumstance where triggering symptoms were identified by hospital emergency room staff is . . . a touchstone in gauging uniform treatment."  <u>Cruz-Vazquez</u>, 717 F.3d at 69.  In <u>Cruz-Vazquez</u>, the First Circuit Court of Appeals found that a trialworthy issue existed as to plaintiff's EMTALA screening claim where plaintiff presented vaginal bleeding in her third trimester and the defendant hospital did not perform testing requirements set forth in the hospital's "Gravid with 3rd Trimester Bleeding" protocol.  <u>Id.</u> at 69-71.  Similarly, in <u>Cruz-Queipo v. Hospital Español Auxilio Mutuo de Puerto Rico</u>, 417 F.3d 67, 70-71 (1st Cir. 2005), the First Circuit Court of Appeals found that the defendant hospital was not entitled to summary judgment for an EMTALA screening claim where the hospital's triage policy required that a patient complaining of chest pain be assigned a triage Category II and the hospital assigned plaintiff to triage Category IV despite the plaintiff's chest pain complaint.[1]  The court reasoned that the error in triage category assignment "marked a departure from the

---

[1] Pursuant to the defendant hospital's triage policy in <u>Cruz-Queipo</u>, emergency room patients are classified into one of four categories, where "Category I encompasses the most serious conditions" and "Categories II, III, and IV encompass progressively less serious conditions."  <u>Cruz-Queipo</u>, 417 F.3d at 68.

Civil No. 13-1918 (FAB)                                                      7

hospital's standards, which 'set the parameters for an appropriate screening.'" Id. (quoting Correa, 69 F.3d at 1193).

Here, the Court identifies four factual allegations in the complaint that support the plaintiffs' EMTALA screening claim: (1) HSG did not provide the "the surgical and radiological consultations . . . that [Adams's] condition required"; (2) HSG did not perform a thoracotomy on Adams; (3) HSG did not "try[] to identify the source of the bleeding and hypotension;" and (4) HSG did not follow its protocols for patients with gunshot wounds or its Advance Trauma Life Support program. (Docket No. 1 at ¶¶ 21, 25-26.) Accepting these factual allegations as true, see Schatz, 669 F.3d at 55, and mindful that the complaint need not include a "high degree of factual specificity," the Court finds that the complaint "*in toto* . . . render[s] plaintiffs' entitlement to relief plausible," see Rodriguez-Reyes, 711 F.3d at 55-56. First, by not providing Adams with the surgical and radiological consultations that his condition required, by not performing a thoracotomy, and by not trying to identify the source of Adams's bleeding and hypotension, it is plausible that HSG did not provide Adams with an examination "reasonably calculated to identify critical medical conditions" when Adams presented himself at the HSG emergency room with multiple gunshot wounds. See Cruz-Vazquez, 717 F.3d at 69.  Second, like the defendant hospital in Cruz-Vazquez that failed to follow its "Gravid with 3rd Trimester

Civil No. 13-1918 (FAB)                                                        8

Bleeding" protocol when a patient presented vaginal bleeding in her third trimester, here, according to plaintiffs' allegations, defendant HSG failed to follow its protocols for patients with gunshot wounds when Adams presented gunshot wounds. See id. Thus, it is plausible that the level of screening that HSG provided Adams was not uniform to the level of screening that HSG provides to all those who present similar complaints of gunshot wounds. See id.

   Defendant HSG does not provide a persuasive argument for the Court to grant its motion to dismiss the EMTALA screening claim. In its motion, HSG lists screening and treatment measures that it provided Adams upon his arrival to the HSG emergency room, claiming that it gleaned these facts from Adams's HSG medical record, and then concludes that "it is evident that the medical and paramedical personnel at [HSG] performed a proper medical screening evaluation which was reasonably calculated to identify [Adams's] conditions." (Docket No. 17 at pp. 6-7, 10-11.) By ignoring the facts alleged in plaintiffs' complaint and relying on its own version of facts, defendant HSG did not present a proper Rule 12(b)(6) argument. See Liu v. Amerco, 677 F.3d 489, 497 (1st Cir. 2012) (explaining that "[t]he place to test factual assertions for deficiencies and against conflicting evidence is at summary judgment or trial," not at the motion to dismiss stage).

   Thus, because plaintiffs plausibly state a claim that defendant HSG did not provide Adams with an appropriate medical

Civil No. 13-1918 (FAB)                                                     9

screening evaluation, defendant HSG's motion to dismiss the EMTALA screening claim is **DENIED**.

**B.   EMTALA Stabilization Claim**

Pursuant to EMTALA's stabilization provision, when a hospital determines that a patient has an emergency medical condition, it "must provide either:  (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section."  42 U.S.C. § 1395dd(b)(1).  EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur *during the transfer* of the individual from a facility."  Id. § 1395dd(e)(3)(A) (emphasis added).  It follows, then, that the EMTALA duty to stabilize applies "only where transfer occurs," otherwise, "no effect is given to the phrase 'during the transfer.'"  Alvarez-Torres v. Ryder Mem'l. Hosp., Inc., 582 F.3d 47, 52 (1st Cir. 2009) (citing Harry v. Marchant, 291 F.3d 767, 771-72 (11th Cir. 2002)).  Thus, the First Circuit Court of Appeals unequivocally held that "a hospital cannot violate the [EMTALA] duty to stabilize unless it transfers a patient, as that procedure is defined in EMTALA."  Alvarez-Torres, 582 F.3d at 51-53 (finding

that "this interpretation is fully in keeping with the statutory intent, since transfer is where the danger of patient dumping often arises"). EMTALA defines "transfer" as:

> the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

42 U.S.C. § 1395dd(e)(4).

Here, Adams was never transferred from HSG: he was never moved to a different facility or discharged. Rather, like the patient in Alvarez-Torres, 582 F.3d at 51-53, who died in the hospital the day after he was admitted and was therefore never "transferred," here, Adams died at HSG ninety minutes after arriving at the hospital, see Docket No. 1 at ¶¶ 13, 20. Thus, because no transfer occurred, plaintiffs are simply unable to establish an EMTALA stabilization claim. See Alvarez-Torres, 582

Civil No. 13-1918 (FAB)                                           11

F.3d at 51-53.  Accordingly, the Court **GRANTS** defendant HSG's motion to dismiss plaintiffs' EMTALA stabilization claim.[2]

### IV. DOCUMENTS APPENDED TO PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS

Plaintiffs attached three documents with certified translations to their opposition to the motion to dismiss: (1) Adams's HSG medical records, (2) HSG's protocol for transferring patients, and (3) HSG's gunshot wound protocols. (Docket Nos. 39-1 - 39-6.)  Defendant HSG relied on the medical records in its motion to dismiss, (Docket No. 17 at p. 6), but avers that the protocols "were obtained through Rule 26 Initial Disclosures and interpreted after the filing of the Complaint," arguing that "discovery should not reveal the necessary proof for the claims asserted in the Complaint," (Docket No. 44 at ¶ 3).

In deciding a motion to dismiss, a court may "[o]rdinarily . . . not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy, Inc.

---

[2] To the extent that plaintiffs allege that HSG violated EMTALA when it "fail[ed] to transfer [Adams] to a trauma center immediately after he was accepted by the recipient hospital, Puerto Rico Medical Center," see Docket No. 1 at ¶ 23, the Court also **DISMISSES** this claim because EMTALA "does not impose any positive obligation on a covered hospital to transfer a critical patient under particular circumstances to obtain stabilization at another hospital." See Fraticelli-Torres, 300 F. App'x at 7 ("A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA anti-dumping violation.").

Civil No. 13-1918 (FAB)                                             12

v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the authenticity of which [is] not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  "When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss."  Alternative Energy, Inc., 267 F.3d at 33 (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)).  In Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000), the First Circuit Court of Appeals "limit[ed]" its consideration of documents outside the complaint to the advertisement at issue because it was the only material that the court deemed "'integral' to assessing the sufficiency of the allegations in the complaint" in ruling on the motion to dismiss a false advertising claim.

   Here, the Court declines to squeeze the attached documents into the "narrow exception."  Although the parties do not contest the authenticity of the documents, and the documents appear to be central to plaintiffs' claims, the Court is of the opinion that the

Civil No. 13-1918 (FAB)                                                    13

issue of the screening examination that HSG provided Adams[3] should be subject to further discovery and would best be resolved upon a motion for summary judgment.  For example, the medical records contain two handwritten physician notes describing Adams's condition and the medical treatment he received.  (Docket No. 39-1 at pp. 5-6.)  Further discovery may reveal different recollections of Adams's condition and treatment.  The medical records are therefore different than the advertisement in <u>Clorox Co. Puerto Rico</u>, 228 F.3d at 32, which the First Circuit Court of Appeals deemed "'integral' to assessing the sufficiency of the allegations" in a false advertising claim, because the medical records may not provide a complete account the facts at issue.  Similarly, assumptions that could be drawn from reading HSG's protocols could lead to different conclusions as to whether HSG followed the protocols, thus giving rise to an issue of material fact.  For these reasons, the Court declines to consider the documents appended to plaintiffs' opposition to the motion to dismiss at this juncture in the litigation.

**V.   PLAINTIFFS' PUERTO RICO LAW CLAIMS**

When a district court has original jurisdiction over a claim, it also has supplemental jurisdiction over state law claims that

---

[3] Consideration of the documents would not alter the Court's dismissal of the EMTALA stabilization claim because, as explained above, it is uncontested that HSG never transferred Adams and the EMTALA stabilization duty applies only when transfer occurs.

Civil No. 13-1918 (FAB)                                                14

form part of the same case or controversy.  28 U.S.C. § 1367(a).  Because plaintiffs' EMTALA screening claim remains, the Court may exercise supplemental jurisdiction over state law claims that "derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  A court should consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving [supplemental] state-law claims."  Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  In light of these factors, as well as plaintiffs' remaining EMTALA claim to ground jurisdiction, the Court will exercise its supplemental jurisdiction over plaintiffs' Puerto Rico law claims.  Accordingly, defendant HSG's motion to dismiss plaintiffs' Puerto Rico law claims is **DENIED.**

**VI.  CONCLUSION**

For the reasons expressed above, the Court **GRANTS** defendant HSG's motion to dismiss the EMTALA stabilization claim. Plaintiffs' EMTALA stabilization claim is **DISMISSED WITH PREJUDICE.** The Court **DENIES** defendant HSG's motion to dismiss the EMTALA screening claim and the supplemental Puerto Rico law claims.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, October 30, 2014.

                                                  s/ Francisco A. Besosa
                                                  FRANCISCO A. BESOSA
                                                  UNITED STATES DISTRICT JUDGE